UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Susie McCoy Hall, Administrator of
The Estate of Barry D. Facto,

      Plaintiff,

     v.                                               Civil Action No. 2:11-CV-37

Michael J. Astrue,
Commissioner of Social Security,

      Defendant.

## **REPORT AND RECOMMENDATION**
(Docs. 14, 19)

Plaintiff Susie McCoy Hall brings this action as Administrator of the Estate of Barry D. Facto[1] pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying Facto's application for disability insurance benefits. Pending before the Court are Plaintiff's motion to reverse the Commissioner's decision (Doc. 14), and the Commissioner's motion to affirm the same (Doc. 19).

For the reasons stated below, I recommend that Plaintiff's motion (Doc. 14) be GRANTED, the Commissioner's motion (Doc. 19) be DENIED, and the matter be REMANDED for further proceedings and a new decision.

---

[1] On January 6, 2012, the claimant, Barry D. Facto, died. (*See* Doc. 26.) Thereafter, given that unpaid social security disability benefits are payable to the estate of a deceased claimant, *see* 20 C.F.R. § 404.503(b)(7), the Administrator of Facto's Estate, Susie McCoy Hall, was substituted as Plaintiff in this action. (*See* Docs. 29, 30.)

## **Background**

Facto was forty-six years old on the alleged disability onset date of October 31, 2007. He completed four years of college but did not graduate. His work experience included jobs as a car salesman, a waiter, a bartender, a restaurant manager, and a machine operator. During the alleged disability period, he lived with his elderly mother and step-father. He was divorced, and had no children. The record includes his reporting to multiple providers that he was emotionally, physically, and sexually abused as a child; and that he had a strained relationship with his family, particularly his mother.

Facto had a long history of low back pain, and had back surgery in December 2006. The surgery appears to have relieved his symptoms for a short period, but then his pain returned. He also had significant shoulder pain, and a May 2008 x-ray showed joint osteoarthritis. In addition to his physical ailments, Facto had a long psychiatric history, including multiple hospital admissions and at least one suicide attempt. He was diagnosed at various times with depressive disorder, generalized anxiety disorder, post-traumatic stress disorder ("PTSD"), adjustment disorder, and bipolar disorder. In association with his PTSD, he experienced nightmares, resulting in poor sleep. He also had a history of alcohol and opioid dependence.

In September 2008, Facto filed applications for social security income and disability insurance benefits. In his disability application, he alleged that his bipolar disorder, PTSD, depression, and back pain forced him to stop working on October 31, 2007. (AR 205.) He explained that he was required to meet with a counselor once a week, and it was difficult for him to "focus on a consistent basis or . . . keep to

consistent work habits." (*Id.*)  Facto's application was denied initially and upon reconsideration, and he timely requested an administrative hearing.  The hearing was conducted on July 12, 2010 by Administrative Law Judge ("ALJ") Thomas Merrill.  (AR 33-62.)  Facto appeared and testified, and was represented by an attorney.  In addition, a vocational expert ("VE") appeared and testified at the hearing.  On September 20, 2010, the ALJ issued a decision finding that Facto was not disabled under the Social Security Act from his alleged onset date through the date of the decision.  (AR 14-26.)  A few months later, the Decision Review Board ("DRB") notified Facto that it had reviewed the ALJ's decision and affirmed it, making it final.  (AR 1-3.)  Having exhausted his administrative remedies, Facto filed the Complaint in this action on February 10, 2011.  (Doc. 3.)  On January 6, 2012, while this action was pending, Facto died.  (Docs. 26, 29.)  Soon thereafter, the Administrator of Facto's Estate was substituted as Plaintiff.  (Doc. 30.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R.

3

Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), meaning "the most [the claimant] can still do despite [his or her mental and physical] limitations," based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945. The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that Facto had not engaged in substantial gainful activity since his alleged onset date of October 31, 2007. (AR 16.) At step two, the ALJ found that Facto had the following severe impairments: "degenerative disc disease of the lumbar spine status post L4-5 laminectomy with discectomy at L5-S1, left shoulder/rotator cuff tendinopathy,

4

generalized anxiety disorder, bipolar disorder, depression, dysthymia, post[-]traumatic stress disorder, alcohol dependence in remission, and poly-substance abuse." (AR 17.) Conversely, the ALJ found that Facto's hypertension was not a severe impairment. (*Id.*) At step three, the ALJ found that none of Facto's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 17-19.) Next, the ALJ determined that Facto had the RFC to perform "light work," as defined in 20 C.F.R. § 404.1567(b), with the following additional limitations:

> [H]e can lift and carry objects weighing up to 20 lbs. occasionally and lift and carry objects weighing up to 10 lbs. frequently, can stand for a total of about 6 hours during a typical 8-hour workday and sit for a total of 6 hours in a typical 8-hour workday, has unlimited use of his hands and feet to push, pull and operate controls, can frequently balance and climb stairs, but can only occasionally climb ladders, ropes, or scaffolds, and can only occasionally stoop, kneel, crouch, or crawl. [He] can only occasionally use his left upper extremity to reach overhead. [He] has the ability to understand and remember up to 4-step tasks; may have some anxiety on starting a job, but is capable of performing with satisfactory concentration, persistence, and pace; and is able to handle routine changes, avoid hazards, travel in public, and show good judgment.

(AR 19-20.) Given this RFC, and based on the VE's testimony, the ALJ found that Facto was capable of performing his past relevant work as a waiter. (AR 25-26.) The ALJ concluded that Facto had not been under a disability from his alleged onset date of October 31, 2007 through the date of the decision. (AR 26.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

5

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should consider that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

### I. The ALJ Erred in His Assessment of the Medical Opinions.

The ALJ adopted the opinions of non-examining agency consultants Drs. Leslie Abramson, Harris Faigel, Geoffrey Knisely, Edward Schwartzreich, Henry Schniewind, and Thomas Reilly; while giving only "some weight" or "limited weight" to the opinions of treating primary care physician Dr. Robert Kiess, treating psychiatrist Dr. Kevin Buchanan, and treating mental health counselor Alison Vanarsdel. (AR 23-25.) In support of this assessment, the ALJ explained that Facto's physical activities, including moving a desk and weightlifting, as well as his failure to pursue treatment modalities, did not "suggest a disabling level of impairment." (AR 25.) Plaintiff argues that the ALJ should have given controlling weight to the opinions of Dr. Kiess and Dr. Buchanan, and that the ALJ erred in adopting the limitations found by agency consultants, whose opinions were derived merely from their review of records. In response, the Commissioner contends that the ALJ properly declined to adopt the opinions of Dr. Kiess and Dr. Buchanan, to the extent that they conflicted with the ALJ's RFC determination.

From July 2006 until at least July 2010, Dr. Kiess treated Facto for back pain, high blood pressure, anxiety, depression, PTSD, bipolar disorder, substance abuse, and other medical issues. (*See, e.g.,* AR 311-462, 723-24, 794-821, 840-52.) In February 2010, Dr. Kiess completed a Medical Statement of Ability to Do Work-Related Activities (Mental) wherein he opined that Facto was "moderate[ly]" limited in his ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions; he was "marked[ly]" limited in his ability to

understand and remember complex instructions; and he was "extreme[ly] limited" in his ability to carry out complex instructions and make judgments on complex work-related decisions. (AR 823.) Dr. Kiess identified as factors to support these opinions Facto's PTSD and bipolar disorder. (*Id.*) Dr. Kiess further opined that Facto was "moderate[ly]" limited in his ability to interact appropriately with the public, supervisors, and co-workers; and "extreme[ly]" limited in his ability to respond appropriately to usual work situations and changes in a routine work setting. (AR 824.) In September 2008, February 2009, and January 2010, Dr. Kiess completed medical reports in connection with Facto's applications for general assistance/food stamps. (AR 313, 727, 798.) In each report, the Doctor stated that Facto was unable to work as a result of his chronic severe depression, PTSD, bipolar disorder, and chronic alcoholism. (*Id.*) Additionally, in July 2010, Dr. Kiess opined in a letter to Facto's attorney that if Facto were to attempt full-time work, "he would miss more than 3 days . . . per month due to any of his impairments." (AR 874.)

Under the "treating physician rule," a treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 567-69 (2d Cir. 1993). Even when a treating physician's opinion is not given controlling weight, the opinion is still entitled to significant consideration, given that the treating physician "[is] likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's]

8

medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). "Under the Commissioner's regulations, the ALJ must consider the following factors when assigning weight to the opinion of a treating source: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) whether the treating physician presents relevant evidence to support an opinion, particularly medical signs and laboratory findings; (4) whether the treating physician's opinion is consistent with the record as a whole; (5) [and] whether the treating physician is a specialist in the area relating to [his or] her opinion . . . ." *Richardson v. Barnhart*, 443 F. Supp. 2d 411, 417 (W.D.N.Y. 2006) (citing *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); 20 C.F.R. § 404.1527(d)(2)-(6)). After considering these factors, the ALJ must give "good reasons" for the weight afforded to the treating physician's opinion. *Burgess v. Astrue*, 537 F.3d 117, 129-30 (2d Cir. 2008); *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

Despite this law, and although it is undisputed that Dr. Kiess was Facto's treating physician who saw Facto frequently for at least a four-year period, the ALJ failed to explain why Dr. Kiess's opinions regarding the severity of Facto's mental impairments were not entitled to controlling weight. In particular, the ALJ did not discuss whether these opinions were "inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2); *see Schisler*, 3 F.3d at 567-69. Moreover, the ALJ did not give good reasons for affording only "some weight" or "limited weight" (AR 24) to Dr.

9

Kiess's opinions. Rather, the ALJ based his assessment of these opinions on the following two factors: (1) Dr. Kiess stated in December 2007 that Facto's back problems had resolved (*see* AR 337-38); and (2) Dr. Kiess was a family doctor and not a psychiatrist or psychologist. (AR 24.) With respect to Dr. Kiess's statement that Facto's back problem had "resolved" (AR 337), this statement alone is not enough reason for the ALJ to discredit all of Dr. Kiess's opinions, particularly those regarding Facto's mental impairments. Moreover, the ALJ's reliance on this statement is strained because the record taken as a whole – including Dr. Kiess's own treatment notes – clearly demonstrates that, although Facto's back pain had lessened after surgery, it eventually returned and then persisted past December 2007. (*See, e.g.,* AR 778-79, 803, 804, 811, 817-21.)

With respect to the ALJ's notation that Dr. Kiess is a primary care physician and not a psychologist or psychiatrist, Plaintiff accurately points out that Dr. Kiess was "involved in Mr. Facto's psychiatric treatment." (Doc. 14 at 12.) Specifically, Dr. Kiess was in contact with Dr. Buchanan, a treating psychiatrist, regarding Facto's mental condition. (*See* AR 844, 846.) Moreover, a review of the record reveals that Dr. Kiess was the physician who was most familiar with Facto's day-to-day mental condition, including his psychiatric hospitalizations and outpatient therapy. Further, Dr. Kiess was at times responsible for prescribing Facto's psychiatric medications, including SEROquel, an antipsychotic, and trazodone, an antidepressant. (*See* AR 311-33, 340-42.)

The ALJ also defended his decision to afford only "some weight" to Dr. Kiess's opinions by stating that, "even under Dr. Kiess's opinion . . ., the [VE] testified to jobs

10

that [Facto] could perform that would be available in significant numbers in the regional economy." (AR 24.) This statement is inaccurate. In fact, the VE testified at the administrative hearing that, if Facto missed two or more days of work each month, "there would be no jobs." (AR 61.) As noted above, in July 2010, Dr. Kiess opined that Facto "would miss more than 3 days of work per month due to any of his impairments." (AR 874.) Moreover, as also noted above, in February 2010, Dr. Kiess found "extreme" limitations in Facto's ability to respond to usual work situations and changes in routine work settings (AR 824); and in September 2008, February 2009, and January 2010, he found that Facto was unable to work in any type of employment, given his "chronic severe depression," PTSD, and bipolar disorder (AR 313, 727, 798, 838).

Another inaccuracy contained in the ALJ's assessment of Dr. Kiess's opinions is the ALJ's statement that "on November 5, 2007, Dr. Kiess noted his conversation with [Facto] in which [Facto] mentioned that 'he must get a new job.'" (AR 21 (citing AR 342).) In fact, Dr. Kiess's treatment note states: "[Facto] *was . . . told* that he must get a new job and *he certainly needs to avoid [a job in] food service* or car sales as they both induce him to alcohol drinking." (AR 342 (emphases added).) From this statement, the ALJ imprecisely reasoned: "The failure of [Dr. Kiess] to indicate [Facto] should not be working coupled with [Facto's] inclination to go 'get a new job' suggests that [Facto] was merely unemployed and not out of work due to the combination of his impairments being disabling." (AR 22.) First, it is unclear from Dr. Kiess's note who had told Facto to get a new job, and whether that individual was a medical professional. Second, it is unclear whether Facto had decided to attempt to follow the command to "get a new job."

11

Third, a fair reading of the note – and certainly a fair reading of the entire record – does not support the assessment that Dr. Kiess opined that Facto was able to work. Fourth and finally, the note plainly demonstrates that Dr. Kiess believed Facto was *not* capable of working as a waiter (a "food service" job), which job the ALJ found Facto capable of performing at step four of the sequential analysis. The ALJ should have acknowledged this discrepancy.

The ALJ also failed to properly assess Dr. Buchanan's opinions, and failed to acknowledge that they were consistent with those of Dr. Kiess. Dr. Buchanan opined in July 2010 that Facto had "moderate"-to-"marked" deficiencies in "concentration, persistence or pace," and "marked" deficiencies in "maintaining social functioning." (AR 868.) Dr. Buchanan further opined that Facto's highest Global Assessment of Functioning ("GAF") score within the year prior to his July 2010 opinion was 40 (AR 867), indicating "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000)).

Although Dr. Buchanan appears to have met with Facto only twice (AR 867), the agency consultants, on whose opinions the ALJ relied, never met with Facto. The general rule in this circuit is that "the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability [because t]he advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant." *Vargas v.*

12

*Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) (quotation marks omitted) (citations omitted). Moreover, the ALJ failed to recognize in his decision that agency consultant Dr. Schwartzreich was unable to account for the opinions of Dr. Kiess or Dr. Buchanan in his report, given that it was completed in February 2009, pre-dating the latest opinions of the treating physicians by at least one year. (*Compare* AR 747, 825, 870, 874.) *See Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (where it is "unclear" whether agency consultant reviewed "all of [plaintiff's] relevant medical information," consultant's opinion is not supported by evidence of record, as required to override the opinion of a treating physician).

The ALJ did not adequately explain his assessment of Dr. Buchanan's opinions, and did not follow the requirements of the treating physician rule. In fact, the ALJ's decision appears to give substantial weight to Dr. Buchanan's opinions, lumping them in with the opinions of agency consultants Drs. Abramson, Faigel, Knisely, Schwartzreich, Schniewing, and Reilly. (AR 25.) Significantly, however, the ALJ's statement that his RFC assessment "is supported by the findings and opinions of . . . Dr. Buchanan" (*id.*) is inaccurate. It cannot be said that the ALJ's RFC determination that Facto "has the ability to understand and remember up to 4-step tasks"; "may have some anxiety on starting a job, but is capable of performing with satisfactory concentration, persistence, and pace"; and "is able to handle routine changes" (AR 20), encompasses Dr. Buchanan's findings that Facto has "marked" difficulties in "maintaining social functioning" and "moderate"-to-"marked" deficiencies in "concentration, persistence[,] or pace" (AR 868). Nor does the ALJ's RFC assessment account for Dr. Buchanan's opinion that Facto's highest GAF

13

score in 2009 and 2010 was only 40. (AR 867.)

In sum, the ALJ made no finding that the opinions of Facto's treating physicians, Drs. Kiess and Buchanan, were inconsistent with other substantial evidence in the record; and in fact, it appears that substantial evidence supports these opinions. Nor did the ALJ consider the regulatory factors and give good reasons for the weight afforded to the opinions of Drs. Kiess and Buchanan. Therefore, the ALJ did not properly apply the treating physician rule, and the matter should be remanded for a new decision.

II.   **The ALJ's Credibility Determination Is Based on Factual Errors and Is Not Supported by Substantial Evidence.**

Next, Plaintiff argues that the ALJ erred in finding Facto's allegations of limitations "somewhat overstated and exaggerated." (AR 20.) If the ALJ's credibility findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints. *Id.* (citing *McLaughlin v. Sec'y of Health, Educ., and Welfare*, 612 F.2d 701, 704 (2d Cir. 1982)). "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996). These reasons "must be grounded in the evidence and articulated in the determination or decision." *Id.*

Here, the ALJ's evaluation of Facto's credibility does not properly account for the "entire case record," and thus is not supported by substantial evidence. For example, the ALJ misrepresented that Facto's 2007 and 2008 hospitalizations were for "episodes . . . secondary to [Facto's] alcohol abuse." (AR 22.) Although the October 2007 admission

was associated with an incident of alcohol abuse, there were other reasons for the admission. The hospital note describes the "Primary Reason[s] for Hospitalization" as "Anxiety, depression, [suicidal ideation], alcohol withdrawal," and states that Facto "reported suicidal ideation wanting to kill self with an ax because of f[ee]ling that life was worthless . . . ." (AR 424, 425.) The note continues: "He was not evaluated until he became clinically sober, at which point he still continued voicing that he would kill himself if he had the tools to do so." (AR 425.) Moreover, contrary to the ALJ's comment, the January 2008 hospitalization appears to have occurred at a time when Plaintiff was abstinent from alcohol, and the relevant hospital note records that Plaintiff "states he took an unknown quantity of Seroquel as well as several Klonopin in an attempt to end his life." (AR 414.) The note further states: "In addition to anxiety, psychiatric review of symptoms is notable for suicidal ideation, anhedonia, poor sleep without medications, feelings of hopelessness [and] . . . worthlessness[,] and poor concentration . . . ." (*Id.*)

There is also a lack of substantial evidence to support the ALJ's statement that "[Facto's] insistence that he be diagnosed with [bipolar disorder and PTSD] tends to suggest that his engaging in counseling was merely for the purpose of obtaining a diagnosis and establishing a treatment record, and not to alleviate any symptoms that may exist." (AR 25.) The record does include statements by Facto's mental health counselor which appear to indicate that she questioned whether Facto had ulterior motives to treatment. For example, she stated: "[Facto] seems to want a measurement of PTSD progress for his lawyer but doesn't seem to know why or how it would benefit him" (AR

15

892); "[b]eginning to wonder of client's motivation" (AR 893).  Notwithstanding these statements, however, mental health counseling was part of an after-care plan that Facto received as he was released from hospitalization, its purpose being to prevent further suicide attempts and reduce the severity of his depression.  (AR 416-17, 428-29.)  His treating physician, Dr. Kiess, also recommended psychiatric counseling to assess his PTSD and bipolar disorder.  (AR 312, 847.)

The ALJ further supported his credibility determination by stating that Facto "failed to attend two appointments for pain injections."  (AR 21.)  From this fact, the ALJ concluded that "[Facto's] level of pain was not as severe as he alleges."  (*Id.*)  The ALJ also pointed out that Facto missed "two out of four" physical therapy appointments.  (*Id.*)  As the record demonstrates, however, Facto's principal impairments were mental, not physical.  (*See* AR 39-40, 205.)  It cannot be deduced from the fact that Facto's back pain was not disabling (even assuming this is true), that Facto's mental impairments also were not disabling.  Moreover, the ALJ over-simplified the record on this point, stating for example: "Dr. Simmons recommended [that Facto] utilize conservative treatment[, which is] . . . inconsistent with [Facto's] allegations of disabling back pain."  (AR 23.)  In fact, the relevant treatment note from Dr. Nathan Simmons summarizes a forty-minute conversation he had with Facto, and states as follows, in relevant part:

> I had a long discussion with Mr. Facto and told him that . . . I do not see any surgical issues. . . .  I would classify his pain as more likely [a] myofascial one rather than a neurogenic one.  Therefore, he *could* have conservative treatment aimed at trigger point injections, TENS unit, etc. . . . Unless there is clear anatomic pathology, I do not think surgery is going to be very beneficial to him.

> He seems somewhat frustrated and perhaps a little bit disappointed. I think that he felt that his severity of symptoms would make him an obvious surgical candidate. . . . I also reiterated that *surgery is recommended not based on the severity of the symptoms but a set of appropriate symptoms that have matching anatomic problems*.

(AR 774-75 (emphases added).) This note clearly demonstrates that Dr. Simmons was merely suggesting forms of treatment for Facto, but did not make an opinion on whether they were likely to diminish or eliminate his pain. More importantly, Dr. Simmons was not questioning the severity of Facto's back pain, as the ALJ implies.

Finally, the ALJ improperly relied on statements made in counselor Vanarsdel's treatment notes to support his credibility determination. Specifically, the ALJ stated:

> Ms. Vanarsdel frequently noted . . . that [Facto] was on time for his appointments with her (several times remarking that he was early), displayed an appropriate affect, was oriented, was clean and appropriately dressed, and once had gelled hair. Ms. Vanarsdel stated twice that [Facto] had prepared coffee, and on one occasion, where [Facto] was early to his appointment, he read a magazine. These items tend to suggest that [Facto] has sufficient concentration, persistence, and pace to read, maintain a routine schedule, complete his activities of daily living, and act appropriately among others.

(AR 18.) Although it was appropriate for the ALJ to consider these factors in assessing Facto's claim, it cannot be said that Facto's ability to appear at weekly one-hour therapy appointments says much about his ability to consistently work at a full-time job. Moreover, it is plausible that even a severely mentally impaired individual could appear on time, clean and appropriately dressed with "gelled hair" for a weekly medical appointment, and could prepare coffee and read a magazine while waiting for the appointment to begin.

Furthermore, although the ALJ noted (a) Vanarsdel's observations of Facto's

17

appearance at their meetings (AR 18), and (b) that Facto asked Vanarsdel "several times" about whether he had PTSD or bipolar disorder (AR 25); the ALJ failed to note the substance of Vanarsdel's notes, some of which are meaningful. For example, in an August 2008 note, Vanarsdel recorded: "Regarding his mother's health, [Facto] is afraid she will die soon, possibly in the next year. He feels his life is nothing without her. . . . He contemplates the idea of suicide if/when his mother does die. Asked him to agree to meet with counsel at least four times following his mother's death before he makes an impulsive decision he can't take back." (AR 722.) In an October 2008 note, Vanarsdel wrote: "[Facto] was somewhat disengaging this session compared to others. Tangential at times, and mildly disor[ie]nted such as him asking if I changed my shoes during the session because they had suddenly looked different to him and during a discussion about classes such as Tai Chi . . ., he said, 'not country music' which appeared off topic." (AR 714.) And in a January 2010 note, Vanarsdel stated: "Fears parents['] death" and "Holds onto distorted belief systems that are unhelpful and can trigger his emotional symptoms." (AR 899.) In a February 2010 note, Vanarsdel recorded: "Reluctant to write out a life story as he feels it would lead to a breakdown. Challenged on ways to do this and still manage emotions." (AR 896.) Finally, in an April 2010 note, Vanarsdel wrote: "Is beginning to talk about child abuse on him . . . . He calls it opening the gates of hell. However his affect is flat when he talks about it and may fluctuate appropriately at other times." (AR 887.) A Psychiatric Evaluation from the same month states:

> Reports long [history] of depression . . . and anxiety, reaching back to childhood. In addition, reports chronic insomnia and nightmares, chronic [suicidal ideation], recurrent [negative] memories. His thoughts are

> focused on the negative [and] past, and he has difficulty seeing any
> [positive] for his future. Admits [suicidal ideation] but denies intent or
> means (no guns) and dislikes all the methods of suicide.

(AR 829.) Although the ALJ was not required to attribute meaning to these statements, he should not have overlooked them completely while assigning significant weight to other statements made by the same provider (counselor Vanarsdel) which merely describe Facto's general demeanor and appearance at weekly therapy appointments.

## **Conclusion**

For these reasons, I recommend that Plaintiff's motion (Doc. 14) be GRANTED; the Commissioner's motion (Doc. 19) be DENIED; and the matter be REMANDED for further proceedings and a new decision in accordance with this ruling. Because I recommend remanding for a re-evaluation of the evidence, the Court need not reach Plaintiff's claims regarding the ALJ's RFC assessment and step-four decision that Facto could perform his past relevant work as a waiter. These findings were based largely on the ALJ's resolution of the competing medical opinions and determination that Facto was not entirely credible. Given that these assessments must begin anew on remand, a new RFC assessment and step-four decision will also be required.

Dated at Burlington, in the District of Vermont, this 9th day of April, 2012.

/s/ John M. Conroy  
John M. Conroy  
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation. *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).